Affirmed and Opinion filed November 23, 2010.

 

In The

 

Fourteenth Court of
Appeals

                                                                                          



NO. 14-09-00335-CV



 

Debra Markwardt, Appellant

V.

Texas Industries, Inc., Appellee

 



On Appeal from the 40th District
Court

Ellis County, Texas

Trial Court Cause No. 77423



 

OPINION

Appellant, Debra Markwardt, appeals a summary
judgment in favor of appellee, Texas Industries, Inc. (“TXI”), in Markwardt’s
suit for trespass, nuisance, negligence, and gross negligence, alleging damages
arising out of emissions from TXI’s cement plant located near Markwardt’s
property.  In ten issues, Markwardt contends the trial court erred by granting
summary judgment on the ground that her claims are barred by the statute of
limitations.  We affirm.

I.                  
Background

            Since 1988, Markwardt
has owned property in Midlothian, Texas, on which she resides and raises dogs
for sale.  For decades, TXI has operated a cement plant within a mile of
Markwardt’s property.  Markwardt contends TXI began burning hazardous waste as
fuel in 1987 or 1988 and emissions from this activity contained toxic substances. 
Markwardt alleges that accumulation of such substances over the years has contaminated
her soil, air, and groundwater, caused her health problems, including chronic
bronchitis, lung problems, fatigue, headaches, ulcers, and nausea, and adversely
affected the health of her dogs. 

On March 12, 2008, Markwardt sued TXI for trespass,
temporary nuisance, negligence, and gross negligence.  She seeks compensation
for lost use and enjoyment of her land, contamination of the property, damages
to her health and well-being, physical pain and mental anguish, damages to the
health and well-being of her dogs, and lost profits in her dog-breeding business. 
TXI filed a traditional motion for summary judgment on the ground that
Markwardt’s claims are barred by the statute of limitations.  In her live
petition and summary-judgment response, Markwardt raised several grounds for
avoiding the limitations bar, including the discovery rule, a CERCLA provision,
the continuing-tort doctrine, and fraudulent concealment.[1]
 

The trial court signed an order granting TXI’s motion
for summary judgment and dismissing Markwardt’s claims with prejudice.  On
March 31, 2009, the trial court signed a judgment nunc pro tunc, correcting a
clerical error in the original judgment.

II.              
Standard of Review

A party moving for traditional summary judgment must
establish there is no genuine issue of material fact and it is entitled to
judgment as a matter of law.  See Tex. R. Civ. P. 166a(c); Provident
Life & Accident Ins. Co. v. Knott, 128 S.W.3d 211, 215–16 (Tex. 2003). 
A defendant moving for summary judgment must conclusively negate at least one
element of the plaintiff’s theory of recovery or plead and conclusively
establish each element of an affirmative defense.  Centeq Realty, Inc. v.
Siegler, 899 S.W.2d 195, 197 (Tex. 1995).  If the defendant establishes its
right to summary judgment, the burden shifts to the plaintiff to raise a
genuine issue of material fact.  Id.  We review a summary judgment de
novo.  Knott, 128 S.W.3d at 215.  We take as true all evidence
favorable to the nonmovant and indulge every reasonable inference and resolve
any doubts in favor of the nonmovant.  Id.[2]

III.           
Analysis

In ten issues, Markwardt contends the trial court
erred by granting summary judgment on the limitations ground.  Markwardt’s
alleged damages essentially fall into three categories: (1) typical nuisance damages
such as lost use and enjoyment of her land; see Schneider
Nat’l Carriers, Inc. v. Bates, 147 S.W.3d 264, 269 (Tex. 2004) (defining “nuisance”
as “a condition that substantially interferes with the use and enjoyment of
land by causing unreasonable discomfort or annoyance to persons of ordinary
sensibilities”); (2) damage to both real property and personal property—her
dogs; and (3) Markwardt’s own personal injuries.  However, it is unclear to
which pleaded claim—nuisance, trespass, negligence, or gross negligence—Markwardt
attributes each element of damages or whether she seeks multiple elements of
damages for each claim.  Nonetheless, all her claims are governed by a two-year
statute of limitations.  See Tex. Civ. Prac.
& Rem. Code Ann. § 16.003(a) (West Supp. 2009); Bates, 147 S.W.3d at 270; W.W.
Laubach Trust v. Georgetown Corp., 80 S.W.3d 149, 158–59 (Tex. App.—Austin 2002, pet.
denied); Am. Centennial Ins. Co. v. Canal Ins. Co., 810
S.W.2d 246, 255 (Tex. App.—Houston [1st Dist.] 1991), aff’d in part, rev’d
in part on other grounds, 843 S.W.2d 480 (Tex. 1992).[3]

The overarching issue is determining when Markwardt’s
claims accrued.  As a general rule, “a cause of action accrues when a wrongful
act causes some legal injury, even if the fact of injury is not discovered
until later, and even if all resulting damages have not yet occurred.”  S.V. v.
R.V., 933 S.W.2d
1, 4 (Tex. 1996).  The discovery rule, when applicable, defers
accrual of a cause of action until the plaintiff knew or, exercising reasonable
diligence, should have known of the facts giving rise to the cause of action.  HECI
Exploration Co. v. Neel, 982 S.W.2d 881, 886 (Tex. 1998).  Another
limitations principle applicable in this case is that accrual of a nuisance claim
depends on whether the nuisance is permanent or temporary.  Bates, 147
S.W.3d at 270.  A permanent-nuisance claim accrues when injury first occurs or
is discovered, whereas a temporary-nuisance claim accrues anew upon each
injury.  Id.  Thus, if a nuisance is temporary, claims for injuries
occurring within two years of suit are timely.  See id.  Determining
when a cause of action accrued is a question of law.  See
id. at 270, 274–75.

A defendant seeking summary judgment based
on limitations must (1) conclusively prove when the cause of action accrued and
(2) negate the discovery rule, if it applies and has been pleaded or otherwise
raised, by proving, as a matter of law, there is no genuine issue of fact about
when the plaintiff discovered, or in the exercise of reasonable diligence should
have discovered, the nature of her injury.  KPMG Peat Marwick v. Harrison
County Hous. Fin. Corp., 988 S.W.2d 746, 748 (Tex. 1999).  If the movant
establishes that limitations bars the action, the nonmovant must then adduce
summary-judgment proof raising a fact issue to avoid the statute of
limitations.  Id.  

In its motion for summary judgment,
TXI argued that Markwardt alleges a permanent-nuisance claim, all her claims
accrued more than two years before she filed suit, and the discovery rule did
not defer accrual.  On appeal, Markwardt contends TXI failed to prove
entitlement to summary judgment on these grounds and also relies on the
continuing-tort and fraudulent-concealment doctrines to avoid limitations.  Some
of Markwardt’s issues are interrelated.  Specifically, in her first and fifth
issues, Markwardt generally contends the trial court erred by granting summary
judgment and concluding TXI proved the accrual date of her claims.  Thus, our
evaluation of these issues incorporates the analysis below of the more specific
limitations issues.

A.        Permanent vs.
Temporary Nuisance

            Preliminarily, we
must address Markwardt’s third issue, challenging the trial court’s implicit decision
that her claim is based on a permanent nuisance.  Markwardt contends the
nuisance was temporary; thus, claims for damages occurring within two years
before filing suit were necessarily timely.  In contrast, TXI contends any
alleged nuisance was permanent; thus, her claim accrued when injury first
occurred or at least when she discovered an injury.  Markwardt’s allegation
that the nuisance is temporary does not preclude our evaluating the nature of
her claim.  A plaintiff may not elect whether to assert a temporary or
permanent nuisance “because the consequences that flow from the designation as
temporary or permanent are not arbitrary but follow directly from underlying
facts.”  Bates, 147 S.W.3d at 281.  “[A]lternative allegations may be
asserted when the facts are unclear.  But when they are not, claimants cannot
opt for an indefinite limitations period or a series of suits whenever they
prefer.”  Id. at 281–82.

            Under Texas law,
a nuisance is permanent if it “involves an activity of such a character and
existing under such circumstances that it will be presumed to continue
indefinitely.”  Id. at 272.  Thus, a nuisance is permanent if it is
“constant and continuous” and if “injury constantly and regularly occurs.”  Id. 
A temporary nuisance is of limited duration.  Id.  Thus, a nuisance may
be considered temporary if it is uncertain whether any future injury will occur
or if future injury “is liable to occur only at long intervals.”  Id.  A
nuisance is also temporary if it is “occasional, intermittent or recurrent” or
“sporadic and contingent upon some irregular force such as rain.”  Id.  “[A]
nuisance should be deemed temporary only if it is so irregular or intermittent
over the period leading up to filing and trial that future injury cannot be
estimated with reasonable certainty.  Conversely, a nuisance should be deemed
permanent if it is sufficiently constant or regular (no matter how long between
occurrences) that future impact can be reasonably evaluated.”  Id. at
281.

Whether a nuisance is permanent or temporary is a
question of law unless there is a dispute regarding what interference has
occurred or whether it is likely to continue.  See id.  A permanent
nuisance may be established by showing that either the plaintiff’s injuries or
the defendant’s operations are permanent.  Id. at 283  “The presumption
of a connection between the two can be rebutted by evidence that a defendant’s
noxious operations cause injury only under circumstances so rare that, even
when they occur, it remains uncertain whether or to what degree they may ever
occur again.”  Id.

In its
motion, TXI relied on both the allegations in Markwardt’s petition and the
summary-judgment evidence to prove she claims a permanent nuisance.[4] 
TXI presented evidence demonstrating that, in late 1997 and 1998, Markwardt vigorously
protested TXI’s application to The Texas Natural Resource Conservation
Commission (“TNRCC”) for a permit to expand its programs which entailed burning
hazardous waste at the facility.  This evidence included a “public comment” by
Markwardt, her deposition, and her testimony submitted to the State Office of
Administrative Hearings (“SOAH”).  TXI also presented various statements,
arguments, and testimony provided by Markwardt to the TNRCC and/or SOAH in
2001, when opposing another company, Chaparral Steel Midlothian L.P.’s
(“Chaparral”), application for a permit relative to its steel mill in the same
area.[5] 
Some of this evidence relative to Chaparral’s permit application also references
Markwardt’s complaints regarding the TXI facility.  Finally, TXI presented the
transcript of a hearing conducted in 2003 by the United States Environmental
Protection Agency (“EPA”), in which Markwardt complained about TXI’s burning of
hazardous waste.

Considering both TXI’s activities and
Markwardt’s alleged damages, we conclude she is claiming a permanent nuisance.  In
particular, Markwardt’s petition and the evidence negate that she complains of
conditions “so irregular or intermittent over the period leading up to filing
[suit] . . . that future injury cannot be estimated with reasonable certainty.”

Significantly, Markwardt alleges in
her petition that TXI has been burning hazardous waste since 1987 or 1988 (twenty
years before she filed suit) and complains of effects accruing “over time” from
“years of accumulation” of toxic substances in the air.  Many of Markwardt’s
remarks during the permit proceedings are repetitive, so we will not set forth
every statement herein.  However, the import of these statements echoed the
gist of her pleading relative to the nuisance issue; i.e., she complained that TXI
had been engaged for many years in the ongoing burning of hazardous waste.  For
example, in 1998, Markwardt swore as follows: in late 1989 or 1990, she began smelling
chemical odors from TXI’s plant and noticed dust accumulation on her property;
the odors became stronger and more frequent over the years; and as of 1998, she
smelled the odors 50% of the time, noticed the dust every day, and was never certain
of a time the odors would be non-existent.[6] 
See Walton v. Phillips Petroleum Co., 65 S.W.3d 262, 274 (Tex.
App.—El Paso 2001, pet. denied), abrogated on other grounds by In re
Estate of Swanson, 130 S.W.3d 144 (Tex. App.—El Paso 2003, no
pet.) (holding landowner’s complaint that oil company’s salt-water pits caused
migration of pollutants into his groundwater alleged permanent nuisance where
water was presently contaminated and had been for several years and there was
never a time where contamination was non-existent or significantly diminished
due to changing conditions, although degree fluctuated).

Additionally, the evidence shows that,
in 1999, TXI was granted its permit, thereby demonstrating the activities of
which Markwardt complained were likely to continue indefinitely.  Notably,
according to her petition, these activities did continue for the approximate ten-year
period between grant of the permit and her filing suit.  

Further, Markwardt does not contend
that, as the emissions occurred, she was uncertain of any future damages.  Instead,
during the permit protests, Markwardt described the following damages she
purportedly had sustained, and continued to experience, as a result of TXI’s
years of burning hazardous waste:

·       
contamination of her drinking
water, as well as her creek and pond, causing the death of fish, frogs, and
turtles;

·       
soil contamination causing stunted
growth or death of vegetation;

·       
inability to enjoy her swimming
pool due to odors and dust film on the water;

·       
birth defects in her dogs, such as
crooked tails, missing limbs, paralysis, abnormal genetic qualities, rotted
teeth, skin problems, watery eyes, cancer, and early mortality, including
deaths of forty to fifty of Markwardt’s puppies and thirty adult dogs;

·       
loss of potential dog sales
because she must tell prospective purchasers that noticeable problems are due
to TXI’s burning of hazardous waste, and purchasers fear future health problems;


·       
her own chronic bronchitis,
depression, anxiety, irritability, headaches, watery and burning eyes and nose,
nausea, ulcers, and compromised immune system;[7]

·       
fear of being outside lest she
exacerbate these health problems; and

·       
lost market value
of her property.

Moreover,
Markwardt represented she had experienced some of these adverse effects for
numerous years before she became involved in the protests.  The gist of Markwardt’s
statements was that these conditions were constant or consistent, and she feared
they would persist in the future if TXI were granted a permit to continue its
activities.  For example, Markwardt characterized the situation with TXI as a
“nightmare” and replied as follows when asked how she felt about living near
the facility:

. . . I built this place of mine for the future and
will I see the future? NO!!!  Unless something is done to stop all this air,
water, and soil pollution.  I wish that my voice could be heard and not in
writing.  This is my life and future, not TXI’s.  When tests are conducted in
this area on animals, plants, water, and soil, why are we excluded.  We are one
of the closest.  Is TXI afraid of finding out what they have contaminated on my
land, with burning the toxic waste the last 8 years?  I’M AFRAID. . . . Just
stop burning the toxic waste and causing the health problems and environmental
contamination that has been created in this area . . . Look at the true effects
that have been caused in this area by TXI burning toxic waste.  5 or 10 years
from now when things get worst [sic], who is going to be responsible? 

 

Markwardt’s allegation regarding lost
market value of her property is pertinent to the nuisance dichotomy.  If a
nuisance is temporary, the landowner may recover only lost use and enjoyment
(measured in terms of rental value) that has already accrued.  Bates,
147 S.W.3d at 276.  An isolated occurrence may result in temporary loss of use
and enjoyment, but is unlikely to result in permanent loss of market value
unless the damage cannot be remedied or is likely to occur again.  Id.  Conversely,
if a nuisance is permanent, the owner may recover lost market value: a figure
that reflects all losses from the injury, including lost rents expected in the
future.  Id.  Consequently, Markwardt’s belief that “people would
not buy a house or land” in the area based on fear of effects from TXI’s
burning of hazardous waste reflects she viewed her damages as permanent.

Nevertheless, Markwardt argues that her
claim is not barred by limitations because she alleges “a new and different
nuisance.”  See id. at 279–80 (recognizing different accrual
rules may apply when nature of nuisance substantially changes and “an old
nuisance does not excuse a new and different one”).  Specifically, she contends
that, although TXI has been operating its plant for decades, it did not start
burning hazardous waste until 1987 or 1988 and she seeks only those damages
caused by this “new and different nuisance.”  However, for the reasons stated
above, the alleged nuisance which began in 1987 or 1988 is classified as
permanent.  Markwardt does not assert any “new and different nuisance” that
began within two years of her filing suit.

Additionally, Markwardt contends the
nuisance is temporary because several months after she filed suit, TXI ceased
operating the kilns that used hazardous waste as fuel.  Markwardt cites the
following statement in Bates: “We begin with the obvious - - if a
nuisance is abated, it is no longer permanent.”  Id. at 284.   However,
this statement must be read in context.  The court was citing a former
decision, in which it held that “[a]n injury which can be terminated cannot be
a permanent injury.”  Id. at 284 & n.98 (citing Kraft v. Langford,
565 S.W.2d 223, 227 (Tex. 1978)).  The Bates court then proceeded to
explain at length the reasons it refused to recognize abatement as a factor in
the analysis of whether a nuisance is temporary or permanent.   See id.
at 283–90.  The court concluded that “abatement may convert a permanent
nuisance into a temporary one, but it also may not” because abating a permanent
nuisance will not always terminate the injury.   Id. at 286.

Significant to the present case, the
court addressed the problematic effects on limitations of using abatement as a
factor.  See id. at 288–89.  If a permanent nuisance has been operating
for many years, limitations will have long since barred suits for lost market
value.  Id. at 288.  However, if the nuisance may be rendered temporary
by later abatement, losses suffered within two years before filing become
recoverable again although they were necessarily part of the same losses that
were previously barred.  Id.  To permit barred claims to be revived
years later would undermine society’s interest in repose and raise
constitutional concerns.  Id.  Therefore, abatement cannot revive barred
permanent damages by allowing them to be asserted as temporary.  Id. at
289.  In the present case, this concern regarding repose would be abrogated if
the lost market value and other permanent damages which Markwardt claimed at
least ten years before filing suit now became recoverable as temporary-nuisance
damages merely because TXI ceased burning hazardous waste after she filed
suit.  Accordingly, we conclude that Markwardt alleges a permanent-nuisance
claim despite abatement of the nuisance.

 

B.        Accrual and the Discovery
Rule

Markwardt’s second, fourth, sixth,
ninth, and a portion of her tenth issues are interrelated; she contends that,
even if the nuisance is permanent, TXI failed to prove she discovered, or
should have discovered, the nuisance claim and her other causes of action more
than two years before she filed suit.

1.         Applicability of the
Discovery Rule

As an initial matter, under Texas
law, the discovery rule is a “very limited exception” to accrual when an injury
is both “inherently undiscoverable” and “objectively verifiable.”  Id.
at 279.  In its motion for summary judgment, TXI contended the discovery rule
is inapplicable because Markwardt’s claims were not “inherently undiscoverable”;
but, alternatively, even if the discovery rule were applicable to these types
of claims, Markwardt discovered, or should have discovered, her claims more
than two years before she filed suit.

However,
Markwardt cites the following
federal statute, contained in CERCLA, governing state statutes of limitations
for hazardous-substance cases:

                In the case of any action brought under State law for
personal injury, or property damages, which are caused or contributed to by
exposure to any hazardous substance, or pollutant or contaminant, released into
the environment from a facility, if the applicable limitations period for such
action (as specified in the State statute of limitations or under common law)
provides a commencement date which is earlier than the federally required
commencement date, such period shall commence at the federally required
commencement date in lieu of the date specified in such State statute. 



42 U.S.C. § 9658(a)(1). 

For purposes of this provision, “federally required commencement
date” is defined as “the date the plaintiff knew (or reasonably should have
known) that the personal injury or property damages referred to in subsection
(a)(1) of this section were caused or contributed to by the hazardous substance
or pollutant or contaminant concerned.”  Id. § 9658 (b)(4)(A).  Thus, this
definition is substantially the same as the discovery rule under Texas law.  See
id.; Neel, 982 S.W.2d at 886; see also Burlington N.
& Santa Fe Ry. Co. v. Poole Chem. Co., 419 F.3d 355, 362 (5th Cir.
2005) (stating, section 9658 engrafts a discovery rule on state statutes of
limitations, deferring accrual of a claim until plaintiff knew or, exercising
reasonable diligence, should have known of the facts giving rise to the cause
of action); Avance v. Kerr-McGee Chemical LLC, No. 5:04-CV-209-DF, 2007
WL 1229710, at *8 (E.D. Tex. Apr. 26, 2007) (recognizing “federally
required commencement date” is “virtually identical” to “notion of an accrual
date” under Texas law, requiring party to commence suit when she knew, or
should have known, of the cause of action).

TXI disputes that CERCLA applies in
the present case.  Further, we note that the above-cited statute does not
mention damages such as pure loss of use and enjoyment of property, as opposed
to actual personal injuries or property damages.  Nevertheless, as discussed
below, we conclude that, even applying the discovery rule, all Markwardt’s
claims accrued more than two years before she filed suit.  Thus, we will
assume, without deciding, the CERCLA provision mandates a discovery-rule
analysis with respect to all Markwardt’s claims regardless of the prerequisites
under Texas law for application of the rule, i.e., that the injury be
“inherently undiscoverable” and “objectively verifiable.”

            2.         Discovery-Rule
Analysis

The evidence
we have discussed relative to the nuisance dichotomy is also pertinent to the
discovery-rule analysis.  As TXI contends, the evidence demonstrates Markwardt has
been complaining, for at least ten years before filing suit, that TXI’s
emissions caused the same damages she seeks in this suit.

Despite her
previous statements, Markwardt relies on a “latent-disease” or “objective-verification”
principle to argue that the discovery rule deferred accrual of her claims until
less than two years before she filed suit.  In Childs v. Haussecker, 974
S.W.2d 31, 37–39 (Tex. 1998), the Texas Supreme Court recognized that, for
limitations purposes, “latent diseases” are different than “traumatic” injuries. 
Therefore, the court not only held that the discovery rule necessarily applies
to “latent diseases,” but also refined the principles for applying the discovery
rule in “latent occupational disease cases.”  Id. at 37–44.  

Specifically,
the court announced that accrual of a “latent occupational disease” claim is
deferred “until a plaintiff’s symptoms manifest themselves to a degree or for a
duration that would put a reasonable person on notice that he or she suffers
from some injury and he or she knows, or in the exercise of reasonable
diligence should have known, that the injury is likely work-related.”  Id.
at 40.  Although diagnosis of a latent occupational disease is sufficient to
start the limitations period, accrual is not necessarily deferred until a
confirmed medical diagnosis or the plaintiff discovers the precise name of the
disease, the fact it is permanent, or the seriousness of the disease; a
plaintiff whose condition has not yet been affirmatively diagnosed by a
physician can have, or in the exercise of reasonable diligence could have,
access to information that requires, or would require, a reasonable person to
conclude he likely suffers from a work-related illness.   Id. at 40–42. 
However, such a cause of action should not accrue absent some “objective
verification” of a causal connection between injury and toxic exposure,
provided that failure to obtain such verification is not occasioned by a lack
of due diligence.  Id. at 43.  Accordingly, a diligent plaintiff’s “mere
suspicion” or “subjective belief” that a causal connection exists between her
exposure and symptoms is, standing alone, insufficient to establish accrual as
a matter of law.  Id.  Inquiries regarding the discovery rule, including
its application in latent-occupational-disease cases, usually entail questions
for the trier of fact.  Id. at 44.  However, commencement of the
limitations period may be determined as a matter of law if reasonable minds
could not differ about the conclusion to be drawn from the facts in the
record.  Id.

            Markwardt suggests her
health conditions constitute latent diseases because they resulted from
repeated exposure to TXI’s emissions.  Therefore, citing Childs, Markwardt
contends her previous statements during the permit protests demonstrated “mere
suspicion” or “subjective belief” that TXI’s emissions caused her damages, but
she did not obtain “objective verification” of a causal connection until June
2006.  TXI does not concede Markwardt has evidence beyond “mere suspicion” or “subjective
belief,” but argues, “to the extent [she] has any such evidence, she has had it
for at least ten years.”

We note that it is unclear whether
the Childs court intended for its refined rules to apply in all cases
involving latent diseases or only those contracted in an “occupational”
setting.  See id. at 37–44.[8] 
Additionally, Markwardt cites no cases from the Texas Supreme Court, our court,
or the Waco Court of Appeals, applying the refined rules outside the context of
“occupational” latent diseases; however, she does cite a Texarkana Court of
Appeals case applying these rules to a plaintiff’s claim that toxic
contaminants from neighboring operations caused her latent diseases.  See
Nugent v. Pilgrim’s Pride Corp., 30 S.W.3d 562, 571–74 (Tex.
App.—Texarkana 2000, pet. denied).  Moreover, although the Childs court
addressed only “diseases” and Markwardt primarily relies on Childs with
respect to her personal-injury claim, she also suggests “objective verification”
was required for accrual of all her claims.

Nevertheless, we need not decide
whether the refined rules set forth in Childs apply to latent diseases
contracted in a non-occupational setting and claims for damages other than
personal injuries because, even applying these rules, Markwardt’s claims are
barred by limitations.  We conclude reasonable minds could not differ that, to
the extent information Markwardt obtained in 2006 constitutes “objective
verification” for limitations purposes of a causal connection between her
damages and TXI’s emissions, Markwardt obtained, or through reasonable
diligence should have obtained, such information at least by 2001 (seven years
before filing suit).

Markwardt’s personal injuries

 To raise a fact issue on whether she
previously possessed mere suspicions that TXI’s emissions were harming her
health, Markwardt cites several statements during the permit proceedings.  When
opposing the TXI application in 1998, she essentially referred    to her own
“beliefs” and “assumptions” regarding such adverse effects, admitted she possessed
no other evidence, and testified no doctor had told her the cause of her
chronic bronchitis.  When opposing the Chaparral permit in 2001, Markwardt testified
her physician, Dr. Ledbetter, said “it’s possible” her conditions were caused
by both TXI and Chaparral emissions although he had not made that diagnosis.

Markwardt presented her own affidavit
as evidence she did not obtain “objective verification” until 2006.  In
particular, Markwardt averred,

It was not until at least June 2006 that I learned
that TXI’s burning of hazardous waste was causing damage to my health.  In June
2006, testing revealed that I had abnormally high levels of aluminum and
manganese in her [sic] body. . . . In September 2006 and April 2007, I was
found to have nodules in my lungs. . . . On May 24, 2007, my doctor at Baylor
told me that he believed my “significant health issues” were likely “due to
aluminum toxicity.” . . . This was the first time a doctor told me my health
problems were likely caused by exposure to toxic substances.  I brought suit on
March 12, 2008, within two years of discovering my injuries. . . .

 

Markwardt also presented the above-referenced
test results, a radiology report confirming nodules in her lungs, and a May 24,
2007 letter from Dr. Ledbetter, summarizing Markwardt’s medical history and
stating:

She has lived in a home that has very high levels of
aluminum in the soil and in the dust that is found in the home.  She has had a
urinalysis that shows her aluminum level to be markedly elevated and it should
be zero. .  . . Today I have referred her to . . . a pulmonary specialist who
has special interest in environmental heavy metal poisoning.  I anticipated
that he will confirm that Ms. Markwardt’s symptoms are in fact due to aluminum
toxicity. . . . 

 

            Considering Markwardt’s
affidavit and Dr. Ledbetter’s report, she may not have obtained, before June
2006, testing confirming elevated levels of toxins in her body or been told by
a doctor, before May 24, 2007, that her health problems were “likely” caused by
such toxins.[9] 
However, we have considered Markwardt’s previous statements during the permit protests
in context when determining whether a reasonable person knew, or should have
known, at that time that her health conditions allegedly resulted from TXI’s
emissions.

Specifically, Markwardt’s 2001
testimony evolved from initially answering “no” when asked whether Dr.
Ledbetter told her the cause of her bronchitis to stating that Dr. Ledbetter
said “it’s possible” her health problems were caused by TXI’s emissions.  However,
she then testified as follows regarding discussions with Dr. Ledbetter: “after
finding out where we live and all that, now it’s kind of narrowed down to more
or less a lot of this is coming from emissions from Chaparral and TXI.”  Therefore,
at that point, Markwardt had obtained information from another source
attributing her conditions to the plant emissions.  In fact, “narrowed down” is
no less emphatic than Dr. Ledbetter’s 2007 opinion that her issues are “likely”
due to toxic exposure, which Markwardt contends triggered the limitations
period. 

Additionally, Markwardt testified in
1998 that she had her drinking water tested several years earlier, which
revealed contamination with elevated levels of aluminum and other metals. 
Although this testing was not performed on Markwardt’s person, she suggested
her health problems were caused not only by breathing toxic substances but also
via contaminated drinking water.  

At the least, Markwardt offers no
reason why, by 2001, she had failed to obtain testing of her person or consult
a physician specializing in “environmental heavy metal poisoning” or a similar
field to confirm her beliefs, considering she had already developed all the
conditions of which she now complains.  The totality of Markwardt’s previous
statements, including the following, support a conclusion that a reasonable
person would have pursued such course of action: despite Markwardt’s references
to mere “assumptions,” she testified at one point, “So my conclusion and my
assumption, there’s only one person responsible for all the problems
in the area is TXI burning the toxic waste” (emphasis added); she claimed “almost
everyone” in the area, including her husband, had health problems which
developed after TXI started burning hazardous waste; at a “Downwinders” meetings
in the early to mid 1990s, doctors and a representative from the American Lung
Association discussed potential long-term health effects of pollutants,
including TXI’s burning of hazardous waste; she also experienced deformities
and deaths in numerous dogs as well as wildlife; she described feeling like “an
experiment sample”; and by 2003, when she testified before the EPA, she
attributed extensive past medical bills to TXI’s activities: “I bet you I
haven’t figured out the health bills.  It’d be in the millions.  I’ve got a
stack of claims like this that my health insurance has paid throughout the years
we’ve lived in Midlothian.”

Finally, we conclude Childs is
factually distinguishable from the present case.  The Childs court found
a genuine issue of material fact concerning when both plaintiffs discovered, or
in the exercise of reasonable diligence, should have discovered, they suffered
from an occupational disease—silicosis.  974 S.W.2d at 44–47.  The court
rejected one plaintiff’s argument that, as a matter of law, his claim accrued
when he was first diagnosed with silicosis.  Id. at 44.  However, the
court also disagreed the claim necessarily accrued at least twenty years
earlier, when the plaintiff experienced respiratory problems, suspected he
might have an occupational illness because several co-workers suffered similar
health problems, including one who died of silicosis, actually filed a workers’
compensation claim alleging he suffered from silicosis, and filed suit to
appeal denial of the claim.  Id. at 44–45.  Although the plaintiff’s
condition deteriorated during this twenty-year period, the court emphasized
that two doctors had told the plaintiff his illness was not work-related
and suggested other specific causes for his condition.  See id. at 45. 
Further, the plaintiff’s workers’ compensation claim and earlier lawsuit were
abandoned precisely because there was no evidence to support a connection
between his condition and his employment.  Id. at 46.

Similarly, the Childs court
rejected the other plaintiff’s suggestion that his claim necessarily accrued
when he was first diagnosed with silicosis—within two years of filing suit.  See
id. at 46–47.  However, the court also disagreed with the defendants’
contention that the claim necessarily accrued several years before filing suit when
the plaintiff experienced respiratory problems which he associated with his
work as a sandblaster, knew he had been exposed to silica, knew his brother,
also a sandblaster, suffered from silicosis caused by breathing occupational
dust, and filed a workers’ compensation claim as a precaution to prevent a time
bar.  See id.  The court did conclude a reasonably diligent person would
have sought medical advice at that point or shortly thereafter, but the
plaintiff did not do so until a year later.  See id. at 47. 
Nevertheless, the court held the claim was not time-barred as a matter of law
because the defendants failed to offer summary-judgment evidence demonstrating
such diligent action would have led the plaintiff to discover he suffered an
occupational disease.  Id.   

In contrast, by 2001, a doctor had
suggested to Markwardt a connection between her conditions and TXI’s emissions,
and testing of her water revealed the contamination that allegedly caused her
health problems, in part.  Moreover, the Childs plaintiffs’ filing workers’
compensation claims as a precaution to toll limitations if their conditions
were work-related is quite different from Markwardt’s public and vehement
insistence under oath, over a period of five years, that her health problems
were caused by TXI’s burning of hazardous waste—a position she adopted so
strongly that she urged denial of a permit for TXI to continue, or increase,
this activity.  Considering all of the evidence, we hold that Markwardt knew,
or through the exercise of reasonable diligence should have known, by 2001, that
her health problems were allegedly caused by TXI’s emissions.  

Nuisance Damages

With respect to the claim for lost
use and enjoyment of her property, Markwardt necessarily discovered this injury
as early as 1998 because the damages are entirely subjective.  Whether TXI’s
emissions actually harmed Markwardt’s health and property is another issue. 
However, by 1998, Markwardt at least expressed fear the emissions were causing
such harm and deprived her of the ability to enjoy her property.  In short,
Markwardt’s own beliefs were the objective verification of an alleged
causal connection between TXI’s emissions and her nuisance damages.

Property Damage

Markwardt contends her suspicions that
TXI’s emissions harmed her dogs were not confirmed until 2006.  Specifically, in
her affidavit, Markwardt averred that testing of some dogs from March 20, 2006 to
May 31, 2006 demonstrated elevated levels of aluminum, chromium, mercury,
nickel and zinc; and, on December 21, 2007, a veterinarian informed her that there
was a “definite possibility” health problems with one dog were “due to a toxin
of some type.”  Markwardt also produced a report from the veterinarian confirming
this statement.

However, in her 1997 public comment
opposing TXI’s permit application, Markwardt stated that, several months
earlier, a puppy collapsed and died and when an autopsy was performed, “[t]hey
found no problems with him whatsoever.  They said it had to be some kind of
toxic fumes that killed him, a four-month-old pup.”  (emphasis added).  In
her 2001 testimony, Markwardt claimed a veterinarian told her on “numerous
occasions” that “it’s very possible” her dogs’ birth defects were caused by
plant emissions.  She further testified that blood testing performed on one
deformed dog showed elevated “T-cells” and the veterinarian said “it could be
possible” this condition was due to plant emissions.  Again, these statements were
substantially similar to the information Markwardt received from the
veterinarian in December 2007, which she claims triggered the limitations
period.

At the least, no later than 2001, Markwardt,
in the exercise of reasonable diligence, could have obtained such verification
if there were indeed a causal connection.  Specifically, during the 2001
proceeding, she agreed that “the Court” had approved Chaparral’s request to
inspect her property, including obtaining stool and blood samples from the
dogs; however, she refused any such inspection unless she was allowed to set
the parameters.  Once again, the totality of Markwardt’s statements during the
permit protests, emphatically attributing health problems and deaths of
numerous dogs to TXI’s emissions, supports a conclusion that a reasonable
person would have pursued such testing of the dogs.  We reject the reasoning
that Markwardt could refuse the testing, when opposing the permit application, yet
years later assert she previously lacked “objective verification” of a causal
connection between plant emissions and her dogs’ health problems, when arguing
her suit is not barred by limitations.

With respect to the alleged
contamination of her real property, Markwardt averred in her affidavit that testing
of the property by the TNRCC, and its successor, the Texas Commission on
Environmental Quality (“TCEQ”), in 1995, 2001, and 2005 produced negative
results.  Markwardt also presented a report published by the TNRCC in October
1995 on the potential impact of emissions from Midlothian industries, concluding
that “exposure to the monitored levels are not likely to result in adverse
health effects” in area residents.  Markwardt further averred that testing of
her land from March 14 to 17, 2006 revealed elevated levels of aluminum, cadmium,
chromium, manganese, and zinc.    Markwardt seems to argue that the TNRCC/TCEQ test
results and report negate she discovered, before the March 2006 testing, a
causal connection between TXI’s emissions and any of her damages.

However, during the permit protests, Markwardt
expressly discounted the TNRCC’s conclusions, claiming she would not “believe”
its test results, pertinent TNRCC officials were “paid off,” the TNRCC did not
conduct adequate testing, and its conclusions were based solely on evidence
submitted by TXI.  The sole fact that she participated in the protests— after
one of the TNRCC studies—demonstrates she was not placated by the TNRCC’s
conclusions.  Consequently, we reject Markwardt’s reasoning that she could dispute
the TNRCC’s conclusions and cite her own testing revealing water contamination,
when opposing the permit applications, yet years later rely on the TNRCC’s conclusions
to argue she previously lacked knowledge TXI’s emissions allegedly harmed her
health and property.

Further, there is no evidence that,
at some point within two years of Markwardt’s suit, the TNRCC/TCEQ changed its
position and agreed with Markwardt’s claims.  In her affidavit, Markwardt did
not identify the entity that conducted the testing in March 2006 which yielded
positive results.  However, she produced evidence that, in December 2007, the
TCEQ remarked, “air toxics monitoring in the Midlothian area not only indicates
acceptable air quality but also better air quality than most monitored areas of
the country.”  Therefore, only a few months before Markwardt filed suit, governmental
authorities continued to conclude the emissions were not harmful.  In sum, the
record reflects this case is not a situation in which governmental authorities
led Markwardt to defer her causes of action until they acknowledged harm from
TXI’s emissions.  Rather, Markwardt has continually maintained since the late
1990s that the emissions were harmful while governmental authorities have continued
to reject such allegations.  Accordingly, we disagree that Markwardt was
permitted to depend on governmental agencies to provide any “objective
verification” needed for her claims to accrue.

Finally, as evidence she could not
have discovered her causes of action more than two years before filing suit, Markwardt
relies on two press releases issued by TXI in 1999, praising the decisions of
the SOAH and the TNRCC on TXI’s permit applications and representing its
activities did not harm the environment and public health.  We conclude the
press releases are more appropriately considered in the fraudulent-concealment
analysis, as discussed below.  However, for purposes of the discovery-rule
analysis, quite simply, a cause of action would likely never accrue if accrual
were deferred until the defendant provided “objective verification” because it
is rare that a defendant would admit liability.  As Markwardt averred in her
affidavit, TXI has always claimed its burning of hazardous waste did not harm
the environment or public health.   Accordingly, we conclude Markwardt may not
depend on TXI to provide any “objective verification” necessary for her claims
to accrue.

            In sum, the trial court
did not err by determining as a matter of law that Markwardt discovered, or
should have discovered, all her claims more than two years before she filed suit. 
We overrule her second, fourth, sixth, and ninth issues and the portion of her
tenth issue addressing the discovery rule.

C.        Continuing-Tort Doctrine

            In another portion of her
tenth issue, Markwardt argues the trial court erred by refusing to apply the
continuing-tort doctrine.  Markwardt cites The Upjohn Co. v. Freeman, 885 S.W.2d 538,
542 (Tex. App.—Dallas 1994, writ denied), in which the court stated that a continuing tort is an
ongoing wrong causing a continuing injury which does not accrue until the
tortious act ceases.

We note that the continuing-tort
doctrine has been addressed by several courts of appeals but not adopted by the
Texas Supreme Court.  See, e.g., Yalamanchili v. Mousa, 316
S.W.3d 33, 40–41 (Tex. App.—Houston [14th Dist.] 2010, pet. filed); Mitchell Energy Corp. v. Bartlett,
958 S.W.2d 430, 443 (Tex. App.—Fort Worth 1997, pet. denied); Upjohn Co., 885 S.W.2d at 542–44; see also
Creditwatch, Inc. v. Jackson,
157 S.W.3d 814, 816 n.8 (Tex. 2005) (noting supreme court has neither endorsed nor addressed
continuing-tort doctrine).  Nevertheless, even courts of appeals addressing the
doctrine have held it does not apply to permanent injury to land.  See, e.g.,
Yalamanchili, 316 S.W.3d at 40–41; Bartlett, 958 S.W.2d at 443.  Accordingly,
the doctrine cannot apply to Markwardt’s causes of action for nuisance and real-property
damages.  See Yalamanchili, 316 S.W.3d at 40–41 (holding
continuing-tort doctrine did not apply to landowner’s trespass claim,
complaining of dead vegetation and foundation damage due to run-off water from
neighboring shopping center because he alleged permanent injury to land); Bartlett,
958 S.W.2d at 443 (holding continuing-tort doctrine inapplicable to landowners’
suit for nuisance, negligence, violation of agency rules, trespass, and fraud,
alleging contamination to his groundwater from oil company’s wells, because
injuries were permanent).

Markwardt contends the trial court
erroneously granted summary judgment on the personal-injury claims because, in
its motion, TXI failed to specifically negate application of the continuing-tort
doctrine to these claims.  In the motion, TXI asserted the continuing-tort
doctrine was inapplicable to TXI’s claims based on permanent injury to land,
but did not specifically mention the doctrine with respect to the claims for Markwardt’s
personal injuries and damages to the dogs.  Assuming, without deciding, that a summary-judgment
movant bears the burden to negate application of the continuing-tort doctrine, TXI
did negate application of the doctrine to these claims.[10]

Both the Waco Court of Appeals, whose
precedent we must follow in this case, and the The Upjohn Co.
court have recognized the continuing-tort doctrine is rooted in a plaintiff’s
inability to know ongoing conduct is causing her injury; thus, the rationale
for the doctrine no longer applies if the claimant has discovered her
injury and its cause and the statute commences to run upon discovery.  Walston
v. Stewart, No. 10-05-00135-CV, 2005 WL 3072919, at *1 (Tex. App.—Waco Nov.
16, 2005, pet. denied) (mem. op.); see The Upjohn Co., 885
S.W.2d at 544 (citing Atha v. Polsky, 667 S.W.2d 307, 310 n.3 (Tex. App.—Austin
1984, writ ref’d n.r.e.); Tectonic Realty Inv. Co. v. CNA Lloyd’s of Tex.
Ins. Co., 812 S.W.2d 647, 654 (Tex. App.—Dallas 1991, writ denied), disapproved
of on other grounds by Johnson & Higgins of Tex., Inc. v. Kenneco Energy,
Inc., 962 S.W.2d 507 (Tex. 1998).  Consequently, TXI essentially negated
application of the continuing-tort doctrine to Markwardt’s claims for personal
injuries and damages to the dogs, despite its lack of specific reference to
these claims, by proving she discovered all her causes of action over two years
before filing suit.  See Walton, 65 S.W.3d at 275 (rejecting
plaintiff’s contention that trial court erroneously granted summary judgment
based on limitations although, in motion, defendant failed to address
plaintiff’s continuing-tort claim; doctrine was inapplicable to permanent
injury to land, and court had already concluded defendant proved plaintiff
alleged permanent injury to land).

Accordingly, the trial court did not
err by refusing to apply the continuing-tort doctrine.  We overrule the portion
of Markwardt’s tenth issue addressing this doctrine.

D.        Fraudulent-Concealment Doctrine


Finally, in her seventh and eighth issues,
Markwardt argues the trial court erred by concluding the fraudulent-concealment
doctrine does not apply to her claims.

The fraudulent-concealment doctrine
is an affirmative defense to the statute of limitations.  See KPMG Peat
Marwick, 988 S.W.2d at 749; Ponder v. Brice & Mankoff, 889
S.W.2d 637, 645 (Tex. App.—Houston [14th Dist.] 1994, writ denied).  Fraudulent
concealment is founded in the principle of estoppel; a
defendant should not be permitted to avoid liability for its actions by deceitfully
concealing wrongdoing until limitations has run.  See
S.V., 933 S.W.2d at 6; Vial v. Gas Solutions, Ltd.,
187 S.W.3d 220, 229 (Tex. App.—Texarkana 2006, no pet.); Bartlett, 958 S.W.2d at 439.  When the doctrine applies, the
statute of limitations is tolled until the injured party, using reasonable
diligence, discovered or should have discovered the injury.  KPMG
Peat Marwick, 988
S.W.2d at 750.  A plaintiff relying on the defense must assert it in response
to the summary-judgment motion and present evidence raising a
fact issue on each element.  KPMG Peat Marwick, 988
S.W.2d at 749.  The elements of fraudulent
concealment are (1) existence of the underlying tort, (2)
the defendant’s knowledge of the tort, (3) the defendant’s use of deception to
conceal the tort, and (4) the plaintiff’s reasonable reliance on the deception.
 Vial, 187 S.W.3d at 229; Bartlett, 958 S.W.2d at 439. 

As we have
mentioned, to support her fraudulent-concealment argument, Markwardt presented
press releases issued by TXI in 1999 after the SOAH’s and TNRCC’s decisions
that TXI should be granted its ten-year permit.  In the press releases, TXI stated:

This decision should put to rest, once and for all,
the inaccurate claims that have been made by our opponents.  The evidence
presented at the hearings provided overwhelming proof that this process meets
tough federal and state safety standards and is safe for the environment. . . .

 

After four months of hearings and more than 50
witnesses, those who oppose this program failed to provide a single medical
doctor or toxicologist who could testify under oath that this program has
harmed or will harm anyone . . . . In fact, studies by the TNRCC, the
Environmental Protection Agency, The Texas Department of Health, as well as the
cities of Arlington, Cedar Hill and Duncanville, all show the program is safe.

 

Exhaustive examination has shown the program meets tough
federal and state safety standards and is safe for the environment. . . . The
TNRCC has validated what we have known all along - - this is an innovative
program that makes good environmental and business sense.

 

Markwardt suggests she relied on
these representations to defer filing suit until 2008.

Relative to the first element of the
fraudulent-concealment doctrine, we will assume, without deciding, that Markwardt
presented more than a scintilla of evidence that emissions from TXI’s plant did
harm her health and property.  However, Markwardt presented no summary-judgment
evidence to support the second and third elements of a fraudulent-concealment
defense: TXI was aware of, and used deception to conceal, this fact.  Fraudulent
concealment requires actual knowledge by the defendant
that a wrong has occurred and “a fixed purpose to conceal the facts necessary
for the plaintiff to know that it has a cause of action.”  Vial, 187 S.W.3d at 230–31; see Bartlett, 958 S.W.2d at 439 (stating, gist of
fraudulent-concealment doctrine is defendant’s active suppression of truth or
failure to disclose when defendant has duty to disclose).

In her brief, Markwardt asserts, “TXI
is presumed to have knowledge of the tort because the tort is based on TXI’s
burning of hazardous waste, an activity of which it was obviously aware.”  TXI’s
obvious knowledge it was burning hazardous waste did not equate to knowledge
this activity harmed the health and property of area residents.  Markwardt
presented no evidence TXI actually believed the emissions were having such adverse
effects on area residents.  Therefore, on this record, TXI’s press releases did
not evince a fixed attempt to deceive the public about any such adverse effects. 
Rather, the press releases were simply a denial that TXI’s activities were
having such adverse effects—a position TXI still maintains today in this suit. 
TXI’s mere adherence to a position contrary to Markwardt’s position did not
constitute evidence of fraudulent concealment of her causes of action.

With respect to the fourth element of
fraudulent concealment, the evidence negates reliance, much less reasonable reliance,
by Markwardt on TXI’s representations.  Once a plaintiff knows, or should know,
of the defendant’s deceit, reliance is no longer reasonable, and the tolling
effect of the fraudulent-concealment doctrine ends.  Bartlett, 958
S.W.2d at 439; see Ponder, 889 S.W.2d at 645 (recognizing estoppel
effect of fraudulent concealment ends when party learns of facts, conditions,
or circumstances that would cause a reasonable person to make inquiry, which,
if pursued, would lead to discovery of cause of action).  Even if there were
evidence that TXI’s press releases were deceitful, Markwardt clearly did not believe
TXI’s representations because she subsequently maintained during the 2001
Chaparral permit proceeding and the 2003 EPA hearing that TXI’s emissions indeed
harmed her health and property.  Moreover, we have already outlined all the
evidence establishing that Markwardt knew, or should have known, by 2001, that
TXI’s emissions allegedly harmed her health and property.  Accordingly, the
trial court did not err by refusing to apply the fraudulent-concealment
doctrine.  We overrule Markwardt’s seventh and eighth issues.

 

IV.            
Conclusion

            Having overruled all of
Markwardt’s contentions pertaining to the specific limitations issues, we
conclude the trial court did not err by determining Markwardt’s claims accrued
more than two years before she filed suit and granting summary judgment in
favor of TXI.  Accordingly, we overrule her more general first and fifth
issues.

We affirm the trial court’s judgment.

 

 

 

                                                                        /s/        Charles
W. Seymore

                                                                                    Justice

 

Panel consists of Justices Yates,
Seymore, and Brown.









[1] Markwardt filed her live pleading after TXI filed its
motion but before the trial court granted summary judgment.  Markwardt did not
add any claims but amended some factual allegations and added grounds for avoiding
the limitations defense.  TXI’s motion was sufficient to encompass the
additional factual allegations and any grounds for avoiding limitations that
TXI bore the burden to negate.  See Espeche v. Ritzell, 123 S.W.3d 657, 664 (Tex. App.—Houston [14th Dist.]
2003, pet. denied) (recognizing, even
when new claim is added in amended petition, if previously-filed
motion for summary judgment is
sufficiently broad to encompass that claim, movant need
not amend the motion).  





[2]
This case was transferred to our court from the Waco Court of Appeals;
therefore, we must decide the case in accordance with the Waco court’s
precedent if our decision would be otherwise inconsistent with its precedent.  See
Tex. R. App. P. 41.3





[3]
In its motion, TXI contended Markwardt did not
allege any personal injuries because her lung problems, fatigue, headaches, and
nausea are merely symptoms of discomfort, not disease;  therefore, by proving
Markwardt’s nuisance claim was barred by limitation, TXI also established
entitlement to summary judgment on all her claims.  See Bates,
147 S.W.3d at 269, 292 (stating plaintiffs alleged only nuisance damages, not  personal
injury, because symptoms were typical of only discomfort, not disease; thus,
assuming without deciding, viable trespass or negligence claim may arise from
mere loss of enjoyment of property, these claims were barred by limitations
because nuisance claim was barred).  However, Markwardt amended her petition
after TXI moved for summary judgment to allege she experienced chronic
bronchitis, lung problems, fatigue, headaches, ulcers, and nausea.   We
conclude that at least chronic bronchitis and ulcers involve more than mere
discomfort.  Nevertheless, TXI also contended alternatively that all Markwardt’s
claims were barred by limitations.  Therefore, we will analyze the limitations
issue relative to all claims and categories of damages alleged by Markwardt.





[4]
In its motion, TXI cited some of the allegations in Markwardt’s original
petition although it was amended after filing of the motion.  Thus, we will
consider only those allegations in the live petition.  





[5]
Markwardt originally included several “Chaparral” entities as defendants in the
present suit but subsequently dismissed her claims against them.





[6]
In her petition, Markwardt asserts she is suing
only for the presence of toxic substances and not mere odors, smoke, soot, or
dust.  However, in the permit protests, Markwardt intermingled all her
complaints about emissions from the plant, whether toxic substances, dust, or
odors.  Thus, we cannot disregard her statements about the dust and odors at
least when evaluating the length and frequency of emissions relative to the nuisance-dichotomy
issue.





[7]
Markwardt also attributed her husband’s numerous health problems to TXI’s
emissions; however, he was deceased by the time she filed this suit.





[8]
In particular, the court made clear at the
outset of its discussion the discovery rule applies in “latent disease” cases. 
See Childs, 974 S.W.2d at 37–40.  The court then indicated it would
further refine the discovery rule for “occupational” cases:  “While a
diligent plaintiff who allegedly suffers from a latent injury or disease should
be able to claim the benefit of the discovery rule, these causes raise
questions about the correct formulation and application of that rule in latent
occupational disease cases.”  Id. at 39.  However, when discussing the
refined rules, the court primarily referred to “latent occupational diseases,”
but intermingled the term “latent diseases” in the discussion several times.  See
id. at 39–44.





[9]
In his letter, Dr. Ledbetter did not attribute the high levels of aluminum on
Markwardt’s person or property to TXI’s operations.  Nevertheless, construing
the evidence in the light most favorable to Markwardt, she interpreted his
opinions as attributing these high levels of aluminum to TXI’s operations. 





[10]
At least one court has suggested that the continuing-tort doctrine is an
exception to the statute of limitations on which the non-movant must present a
genuine issue of material fact.  See Palombo v. Southwest Airlines
Co., No. 04-05-00825-CV, 2006 WL 1993783, at *4 (Tex. App.—San
Antonio Jul. 19, 2006, pet. denied) (mem. op.).