

# COURT OF APPEALS

## SECOND DISTRICT OF TEXAS
## FORT WORTH

---

### NO. 02-11-00392-CV

| | |
|---|---|
| PASQUINELLI PORTRAIT HOMES-DURANGO RIDGE LP, PORTRAIT HOMES-TEXAS, L.L.C. AND PASQUINELLI, GP, AND BROCKETTE/DAVIS/DRAKE, INC. | APPELLANTS |

V.

| | |
|---|---|
| SECURLOCK AT BEDFORD, LTD. | APPELLEE |

| | |
|---|---|
| SECURLOCK AT BEDFORD, LTD. | APPELLANT |

V.

| | |
|---|---|
| PASQUINELLI PORTRAIT HOMES-DURANGO RIDGE LP, PORTRAIT HOMES-TEXAS, L.L.C. AND PASQUINELLI, GP | APPELLEES |

----------

### FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

----------

# MEMORANDUM OPINION[1]

----------

Pasquinelli Portrait Homes-Durango Ridge LP, Portrait Homes-Texas, L.L.C., and Pasquinelli, GP (collectively, Portrait Homes) and Brockette/Davis/Drake, Inc. (BDD) appeal the trial court's judgment against them in favor of appellee Securlock at Bedford, Ltd. We affirm in part and reverse and remand in part. Securlock cross-appeals the trial court's orders granting Portrait Homes's motions for directed verdicts. We affirm.

## Background Facts

Securlock owns and operates a storage facility in Bedford, Texas. Portrait Homes owned property adjacent to the storage facility known as the Durango Ridge Addition. In 2004, Portrait Homes hired BDD to design a storm water drainage system for its property. The drainage system diverted surface water through underground pipes to a detention pond and then to a box culvert in front of Securlock's property. Portrait Homes submitted BDD's plans to the City of Bedford and to the Texas Department of Transportation for approval in late 2004. In order to create the system, Portrait Homes and Securlock entered into a consent agreement in which Securlock allowed Portrait Homes to enter Securlock's property to remove existing water pipelines and headwalls and to

----

[1]*See* Tex. R. App. P. 47.4.

install larger ones. In early 2005, Portrait Homes constructed the system according to BDD's design.

On July 5, 2006, Securlock discovered flooding at its property. Securlock found that Portrait Homes had placed erosion control devices on two gutter inlets running perpendicular to the storage facility. The devices prevented debris from entering the underground drainage system, but it also prevented the rainwater from draining properly. Portrait Homes removed the devices after Securlock complained.

Securlock reported no problems with flooding for approximately six months. However, on December 30, 2006, Securlock's property began flooding again, and it continued to flood during every rainstorm through July 2007. Securlock hired engineers to investigate the flooding. They reported a number of problems with Portrait Homes's drainage system that they believed caused the flooding. Securlock filed suit against Portrait Homes, BDD, and some of Portrait Homes's contractors on September 25, 2008, for violations of the Texas Water Code, negligence, nuisance, trespass, and breach of contract.

A jury trial was held in early 2011. The jury found that Portrait Homes was 57% liable for Securlock's damages, that BDD was 25% liable, and that Securlock was 3% liable for its own damages.[2] The trial court awarded

_____

[2]The jury also found that the contractors, W.R. Hodgson Co., LP, and WRH Construction, LLC, (together, Hodgson) and J. Guzman Construction, Inc., and J.E. Guzman Construction, Inc. (together, Guzman), were 10% and 5% liable, respectively.

3

Securlock $1,537,450 in actual damages plus prejudgment interest and costs. Portrait Homes and BDD timely filed their appeals.[3] Securlock also appealed.

## Discussion

### I. Portrait Homes and BDD's appeals[4]

#### A. Statute of limitations

In Portrait Homes's first issue, it argues that the statute of limitations bars Securlock's claims against it. Securlock's negligence, trespass, nuisance, and water code claims are governed by limitations periods of two years. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.003(a) (West Supp. 2012) ("[A] person must bring suit for trespass for injury to the estate or to the property of another . . . not later than two years after the day the cause of action accrues."); *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 270 (Tex. 2004) (applying section 16.003 to a nuisance claim); *Graham v. Pirkey*, 212 S.W.3d 507, 512 (Tex. App.—Austin 2006, no pet.) (applying section 16.003 to water code claims); *Tex. Am. Corp. v. Woodbridge Joint Venture*, 809 S.W.2d 299, 303 (Tex. App.—Fort Worth 1991, writ denied) (applying section 16.003 to a negligence claim).

---

[3]The trial court found that Securlock's claims against Guzman were barred by limitations, that Hodgson was liable to Securlock for the damages caused by Guzman, and that Hodgson had an indemnity claim against Guzman. Guzman paid Hodgson, and Hodgson satisfied Securlock's judgment against it. Neither Guzman nor Hodgson are parties to this appeal.

[4]Portrait Homes and BDD appealed separately and filed separate briefs. BDD later filed a letter brief in which it adopted and joined in Portrait Homes's brief.

Accrual of limitations is a question of law for the court, but "material factual disputes about frequency, duration, and extent of nuisance conditions" are questions for the factfinder. *Schneider Nat'l Carriers*, 147 S.W.3d at 274–75.

Accrual of Securlock's claims depends on whether the flooding is properly characterized as a permanent or temporary nuisance. *Id*. at 270. A permanent nuisance is a constant and continuous activity that may be presumed to continue indefinitely. *Id*. at 272. A permanent nuisance claim accrues when the first injury occurs. *Id*. at 270. A temporary nuisance, however, is of "limited duration," and "it is uncertain if any future injury will occur." *Id*. at 272. A temporary nuisance claim "accrues anew upon each injury." *Id*. at 270.

Securlock was first flooded in July 2006. It claims that the first flood was the result of the sewer inlets being covered with erosion control devices that Portrait Homes was required to install during construction.[5] After Securlock complained to Portrait Homes, Portrait Homes removed the devices. Securlock reported no more flooding for approximately six months. Securlock argues that because the first flood was caused by a different problem than all of the subsequent flooding, accrual did not begin until the first flood not caused by the erosion control devices; that is, not until December 30, 2006, when the flooding was caused by Portrait Homes's drainage system.[6]

---

[5]Securlock's petition does not complain of this first flood.

[6]Andrew Smith, who worked for Securlock's management company, testified that Securlock had no way of knowing if Portrait Homes's drainage

Portrait Homes argues that flooding by rainwater is a permanent injury as a matter of law. *See Yalamanchili v. Mousa*, 316 S.W.3d 33, 38 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *Mitchell v. Timmerman*, No. 03-08-00320-CV, 2008 WL 5423268, at *6 (Tex. App.—Austin Dec. 31, 2008, no pet.) (mem. op.); *Pope v. John Kiella Homes*, No. 07-06-0146-CV, 2008 WL 1903332, at *3–4 (Tex. App.—Amarillo Apr. 30, 2008, no pet.) (mem. op.). In these cases, however, there was no dispute as to the source of the floods; the floods resulted from permanent structures and were therefore permanent nuisances. *See Yalamanchili*, 316 S.W.3d at 38 ("[T]he structure creating the runoff, Mousa's shopping center, is a permanent structure, and such a permanent source is presumed to result in a permanent nuisance."); *Mitchell*, 2008 WL 5423268, at *6 (holding that the defendant's permanent drainage system created a permanent nuisance); *Pope*, 2008 WL 1903332, at *4 (noting that the source the plaintiffs "blame[d] for their injuries, the Briarcrest subdivision, is permanent").

In the present case, Securlock presented evidence that the first flood was caused by a temporary problem—that of erosion control devices. It claims that once the devices were removed, the flooding ceased until Portrait Homes built new houses, which caused the flooding starting in December 2006. *See Mitchell*

system functioned properly until the erosion control devices had been removed. Portrait Homes's witness, Bruno Pasquinelli, testified that Portrait Homes was required by the government to put the erosion control devices on the inlets and admitted that with the devices on, the inlets were "less functional" than they should have been and that Portrait Homes could not have determined how well-functioning the drainage system was until the devices were removed.

6

*Energy Corp. v. Bartlett*, 958 S.W.2d 430, 443 n.8 (Tex. App.—Fort Worth 1997, pet. denied) ("The ability to terminate tortious conduct is a characteristic of a temporary injury to land."). The source of the first flood is therefore a question of fact and was properly presented to the jury. *See Schneider*, 147 S.W.3d at 286 (noting that if the nature of a nuisance is in dispute, then categorizing the nuisance as permanent or temporary is a question for the jury). We overrule Portrait Homes's first issue.

## B. The limitations question in the jury charge

In Portrait Homes's second issue, and in BDD's first issue, they argue that the jury question on limitations was improper. The question asked of the jury was,

> By what date did Securlock discover—or in the exercise of reasonable diligence should Securlock have discovered—that the flooding of its storage facility was caused by the acts or omissions of any of the defendants that serve as the basis for this lawsuit?

Portrait Homes and BDD objected at the charge conference, and their objections were overruled. *See State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) ("There should be but one test for determining if a party has preserved error in the jury charge, and that is whether the party made the trial court aware of the complaint, timely and plainly, and obtained a ruling.").

The question is improper for two reasons. First, under the discovery rule, the limitations period begins at the time that the injury is discovered. *See Mitchell Energy*, 958 S.W.2d at 436 ("Because a plaintiff's cause of action for

7

damage to property accrues when the plaintiff discovers or should have discovered the *fact* of the injury, the trial court erred when it asked the jury . . . to determine when the plaintiffs discovered the *cause*, if any, of their polluted water."). Second, the phrase "that serve as the basis for this lawsuit" is problematic. Securlock stated repeatedly that it was not suing for the July 2006 flood. Thus, the question forces the jury to respond with a date after July 2006 because that flood, and the acts or omissions of the defendants that may have caused that flood, did not serve as the basis for Securlock's lawsuit.

Because we hold that the jury questions on limitations was defective, we sustain Portrait Homes's second issue and BDD's first issue. The remedy for a trial court's submission of an improper question on a material issue is to remand the case for a new trial with instructions to submit the issue properly to the jury. *See id.* at 437 (citing *Spencer v. Eagle Star Ins. Co.*, 876 S.W.2d 154, 157 (Tex. 1994)). Because we hold that Portrait Homes and BDD are entitled to a new trial based on their second and first issue respectively, we do not need to reach Portrait Homes's fifth issue regarding the sufficiency of the evidence or BDD's third issue regarding cumulative error. *See* Tex. R. App. P. 47.1; *Dickinson v. Dickinson*, 324 S.W.3d 653, 659 n.2 (Tex. App.—Fort Worth 2010, no pet.). However, in the interest of judicial economy, we will address those issues which are likely to arise on remand. *See Edinburg Hosp. Auth. v. Trevino*, 941 S.W.2d 76, 81 (Tex. 1997); *Nu-Way Energy Corp. v. Delp*, 205 S.W.3d 667, 684 (Tex. App.—Waco 2006, pet. denied).

8

**C. Texas Water Code**

In Portrait Homes's third issue, it complains that Securlock has no viable claim under section 11.086 of the water code as a matter of law. Section 11.086 states, "No person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded." Tex. Water Code Ann. § 11.086(a) (West 2008). Portrait Homes's argument is premised on its contention that the water that flooded Securlock's facility was not "surface water" under the water code.

Surface water, as used in the water code, means water "which is diffused over the ground from falling rains or melting snows, and continues to be such until it reaches some bed or channel in which water is accustomed to flow." *Dietrich v. Goodman*, 123 S.W.3d 413, 419 (Tex. App.—Houston [14th Dist.] 2003, no pet.). "When rainfall is under control, either by ditches, tanks, ponds, or pipes, it no longer is considered surface water." *Dalon v. City of DeSoto*, 852 S.W.2d 530, 538–39 (Tex. App.—Dallas 1992, writ denied). That is, once rainwater is controlled, resulting floods are not actionable under section 11.086. *See City of Whitesboro v. Williams*, No. 05-99-01840-CV, 2001 WL 66427 (Tex. App.—Dallas Jan. 29, 2001, no pet.) (not designated for publication) (holding that plaintiffs did not have a cause of action under section 11.086 because the water that flooded their house came from the sewer system and was thus not surface water).

9

## 1. The source of the water that flooded Securlock

At trial, Securlock's expert, Mark Pacheco, testified that Securlock flooded because the Durango Ridge sewer system backed up so that rainwater could not enter the system. He explained,

> Because the water surface elevation was not correct—it was actually much higher than what was shown on the Durango Ridge plans—that would cause the water to backup in that new storm sewer that had been built as part of Durango Ridge—would backup into the detention pond.
>
> And we also, in our review of the detention pond calculations and design, determined that the orifice plate, the outflow of the detention pond, had not been designed correctly, and so it also caused the water surface in the pond to rise higher than was originally planned or designed on the plans. The result of that is, is that there are two curb inlets in Durango Ridge—that I mentioned earlier—that drained into a pipe that goes into the detention pond. And with that detention pond being higher, the water backs up into those inlets, and so they are not able to collect the water that's coming down Durango Ridge Drive. So while the water's coming down Durango Ridge Drive, instead of being able to enter those two inlets, since the water has backed up and submerged those inlets, the water continues across, goes into the intersection of Park Avenue and goes into the Securlock facility.

A letter and a report by Pacheco to Securlock also stated that because the curb inlets were submerged, rainwater in the streets bypassed the sewer system and flowed into Securlock's property.

Luis Salcedo, Portrait Homes's civil engineering expert, testified that photographic and video evidence taken in September 2010 "showed that the inlets in Durango Ridge were capturing all the water, nothing was bypassing the inlets, and the pond in Durango Ridge was functioning perfectly to pass the flow

10

through."  In his report, Salcedo opined that the "detention pond [was] not the cause of the" flooding.

## 2. Securlock's water code claim

Portrait Homes argues that Securlock has no claim under the water code because "the water affecting Securlock's storage facility flowed through an artificial drainage system comprised of pipes and a detention pond."  Because the water was controlled through the drainage system, the water was no longer diffused surface water.  *See Dietrich*, 123 S.W.3d at 420 ("When rain water fell directly on the tennis courts and wooded acreage on the night of the flood at issue, it undeniably possessed the character of surface water.  When the water entered the channel leading to the storm sewer, its character changed.").  However, Securlock presented evidence that the water that flooded its property never entered the drainage system.  Instead, because of alleged faults in the sewer system, the rainwater was diverted down the streets of Durango Ridge and onto Securlock's property.  If the flood was the result of this diversion (instead of, say, water overflowing from the detention pond), then Securlock does have a claim under section 11.086.  Because there is evidence that Securlock was flooded by surface water, Securlock is not barred as a matter of law from asserting a claim under the water code.[7]  We overrule Portrait Homes's third issue.[8]

---

[7]We do, however, disagree with Securlock's contention that "[t]he fact [that] the rain water may have flowed through all or part of a defective drainage system

11

**D. Definition of "surface water"**

In Portrait Homes's fourth issue, it complains that the trial court submitted an incorrect definition of surface water.

Question No. 1 of the jury charge asked,

> Did Portrait Homes divert or impound the natural flow of surface water, or permit a diversion or impounding by it to continue, in a manner that damaged Securlock's property by the overflow of the water diverted or impounded?
>
> "Surface water" means water which is diffused over the ground from falling rains or melting snows, and it continues to be such until it reaches some bed or channel in which water is accustomed to flow.

Portrait Homes objected in the trial court that the definition was incomplete. It argues that a complete definition would state that surface water "only encompasses water untouched and undirected by the hands of man, and excludes water subjected to prior man-made changes in its flow."

---

before reaching Securlock's property does not diminish . . . Portrait Homes'[s] liability under the Texas Water Code." Flooding resulting from water under the control of "ditches, tanks, ponds, or pipes" is not actionable under section 11.086. *Dalon*, 852 S.W.2d at 538–39. Securlock's attempt to distinguish the present case from *Dalon* on the ground that *Dalon* concerned natural waterways whereas the control measures here are man-made is unconvincing. *Dalon* specifically notes that water in "tanks" and "pipes," neither of which are natural waterways, is not surface water. *Id*.

[8]Portrait Homes makes arguments in the alternative concerning the sufficiency of the evidence supporting Securlock's water code claim. Because our disposition of Portrait Homes's second issue requires us to remand for a new trial, we do not need to address the alternative arguments.

The contention that section 11.083 applies only to water that is "untouched by the hands of man," appears to be based on two 1932 supreme court cases. *See Miller v. Letzerich*, 121 Tex. 248, 254, 49 S.W.2d 404, 408 (1932); *Bunch v. Thomas*, 121 Tex. 225, 229, 49 S.W.2d 421, 423 (Tex. 1932); *see also Jefferson Cty. Drainage Dist. No. 6 v. Lower Neches Valley Auth.*, 876 S.W.2d 940, 950 (Tex. App.—Beaumont 1994, writ denied) (citing *Bunch* and *Miller* for the proposition that section 11.086 affords no protection to upstream landowners when the drainage "has been touched by the hands of man"). However, the postures of the parties in *Miller* and *Bunch* are different from the situation here, and that difference is critical to understanding the holdings of those cases.

Both *Miller* and *Bunch* hold that the lower estate has the burden to receive surface waters from the upper estate that pass to its land in their natural, diffused state. *Miller*, 121 Tex. at 254, 49 S.W.2d at 408 ("[L]ands lower than the coterminous estate owe a service to receive the burden of surface waters which may flow from the higher estate onto the lower, so long as the surface water from the dominant estate reaches the borders of the servient one untouched and undirected by the hands of man."); *Bunch*, 121 Tex. at 229, 49 S.W.2d at 423. However, in both cases, the upper estate had channeled water in such a way that it reached the lower estate in an "unnatural way"—that is, in a condensed or accelerated state. *Miller*, 121 Tex. at 267, 49 S.W.2d at 414 (noting that plaintiff wanted to "cause [water] to pass off onto the lands of the defendants in error in increased quantities, in a different state[,] and in a manner well calculated to

13

inflict injury"); *Bunch*, 121 Tex. at 227, 49 S.W.2d at 422 (noting that the plaintiff "cut ditches . . . which concentrated the water and caused it to reach the Thomas land in this form"). In *Miller*, the plaintiff wanted to repair ditches and a levee that would "divert the natural flow of surfac[e] waters from the [plaintiff's land] on to that of the defendants." 121 Tex. at 250, 49 S.W.2d at 406. In *Bunch*, the defendant built an embankment that "thr[ew] . . . water back" water that the plaintiff had "thrown upon her." 121 Tex. at 228, 49 S.W.2d at 423.

The Supreme Court held that the upper estates had no cause of action against the lower estates under the water code because the law does not burden the lower estates with the requirement that they must receive these diverted waters.[9] *Miller*, 121 Tex. at 267, 49 S.W.2d at 414; *Bunch*, 121 Tex. at 231, 49 S.W.2d at 424 ("[I]n our opinion, appellees' land is not burdened with any servitude to receive water not naturally flowing upon the same.") (quoting *Higgins*

---

[9]*Miller* and *Bunch* rely on a prior but substantially similar version of section 11.086, which stated,

> That it shall hereafter be unlawful for any person, firm or private corporation to divert the natural flow of the surface waters in this State or to permit a diversion thereof caused by him to continue after the passage of this Act, or to impound such waters, or to permit the impounding thereof caused by him to continue after the passage of this Act, in such a manner as to damage the property of another, by the overflow of said water so diverted or impounded, and that in all such cases the injured party shall have remedies, both at law and in equity, including damages occasioned thereby.

*See* Act of February 19, 1927, 40th Leg., R.S., ch. 56 § 1, 1927 Tex. Gen. Laws 80, 80–81.

*v. Spear*, 283 S.W. 584, 587–88 (Tex. Civ. App.—El Paso 1926), *aff'd*, 118 Tex. 310, 15 S.W.2d 1010 (1929)). Thus, when *Miller* and *Bunch* state that the water code affords no protection for waters directed by man-made measures, they are speaking to the upper estate's cause of action against the lower estate, not the other way around. *See Boatman v. Lites*, 970 S.W.2d 41, 44 (Tex. App.—Tyler 1998, no pet.) ("If the water has been altered by the hands of man so that it flows in greater quantities or is directed or accelerated, then the property owner has the right to divert that water to protect his land."); *Jefferson Cnty. Drainage Dist.*, 876 S.W.2d at 950 (relying on *Bunch* and *Miller* for the proposition that section 11.086 affords no protection to upper estates for damage to their property when they have altered the water's natural drainage and the lower estate prevents the water from entering its land); *Mitchell v. Blomdahl*, 730 S.W.2d 791, 792 (Tex. App.—Austin 1987, writ ref'd n.r.e.) (holding that upper estate could not sue lower estate under section 11.086 after lower estate "dump[ed] fill, dirt, and rocks onto his property" to keep water from entering when construction of streets "channeled and directed the . . . flow of water . . . , increasing the volume of water flowing across the [upper estate] and onto [the lower estate]"); *Bishop v. Harris*, 669 S.W.2d 859, 861 (Tex. App.—Tyler 1984, writ dism'd w.o.j.) (applying *Miller* and *Bunch* and holding that lower estate did not violate section 11.086 by building retaining wall because the water it was designed to repel "was concentrated and accelerated by the construction of the parking lots and buildings"). In fact, *Miller* noted that even though the plaintiff's ditch was an

15

"artificial drainway" created by the plaintiff, the waters that flowed through it would still be actionable under the statute. 121 Tex. at 252, 267, 49 S.W.2d at 407, 414 ("[I]t is apparent when one wrongfully diverts surface water and causes it to flow over another's land, causing damage, his acts are within the prohibitory terms of the statute, and a cause of action arises."). Thus, the definition of surface water argued by Portrait Homes that included the statement that section 11.086 applies only to "water untouched and undirected by the hands of man" is incorrect. *See Tex. Woman's Univ. v. The Methodist Hosp.*, 221 S.W.3d 267, 283 (Tex. App.—Houston [1st Dist.] 2006, no pet.) ("[N]othing in section 11.086 suggests that accumulated rainfall is no longer diffused surface water once it has been, in any way, diverted by artificial means or touched by the hands of man.") (citing *Dalon*, 852 S.W.2d at 539 ("[T]he surface water remains surface water since it is being diverted by artificial means.")). We overrule Portrait Homes's fourth issue.

### E. Evidence of the appraised value

In Portrait Homes's sixth issue, it argues that the trial court erred by excluding evidence of the appraised value of Securlock's property. The trial court had granted Securlock's motion in limine, which prohibited "[a]ny question, reference[,] or statement as to the value of Securlock's property used by the Tarrant County Appraisal District, as assessment rolls are not competent evidence of the value of Securlock's property." After Securlock's damages expert testified regarding his opinion of the pre-flood value of Securlock's

16

property, Portrait Homes argued that it be allowed to introduce evidence regarding the Tarrant County Appraisal District appraisal "to contradict an affirmative assertion by a plaintiff as to the value of the facility." The trial court denied Portrait Homes's request that it change its ruling.

Portrait Homes claims that the trial court erred by denying the admission of the evidence because "rendition for taxes and the values upon which same are paid are material and admissible by way of impeachment or contradiction . . . . They amount to admissions against interest." *Warren v. Premier Oil Ref. Co.*, 173 S.W.2d 287, 291 (Tex. Civ. App.—Eastland 1943, writ ref'd w.o.m.). Portrait Homes offered "a page from the appraisal district showing what the five-year historical value for this property was," not a rendition statement. A rendition statement is rendered by the property owner and must contain "the property owner's good faith estimate of the market value of the property or, at the option of the property owner, the historical cost when new and the year of acquisition of the property." *See* Tex. Tax Code Ann. § 22.01(a)(5) (West Supp. 2012). Securlock noted at trial that Portrait Homes's exhibit was "a printout from a Web site with numerous handwritten writings that have not been properly authenticated or proved up." Appraisal records are prepared by the chief appraiser, not the property owner. *See id.* § 25.01(a) (West 2008). They are therefore not admissions against interest like rendition statements. *See Houston Lighting & Power Co. v. Fisher*, 559 S.W.2d 682, 686–87 (Tex. Civ. App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.) ("[T]ax assessments rarely reflect the

17

true market value."); *Hous. Auth. of City of Dallas v. Brown*, 256 S.W.2d 656, 659 (Tex. Civ. App.—Dallas 1953, no writ) ("It is generally known that values reflected by the tax rolls do not reflect actual value. Custom usually sets the approximate percentage of actual value for such assessment."). We overrule Portrait Homes's sixth issue.

**F. Standard of care for BDD**

In its second issue, BDD argues that the trial court incorrectly denied its proposed negligence question and submitted one that did not recite the proper standard of care for BDD. The negligence question that was submitted to the jury for all the defendants read,

> Did the negligence, if any, of those named below proximately cause damage to Securlock's storage facility in Bedford, Tarrant County, Texas?
>
> "Negligence" means failure to use ordinary care, that is, failing to do that which a similarly situated party of ordinary prudence would have done under the same or similar circumstances or doing that which a party of ordinary prudence would not have done under the same or similar circumstances.
>
> "Ordinary care" means that degree of care that would be used by a similarly situated party of ordinary prudence under the same or similar circumstances.
>
> "Proximate cause" means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a similarly situated party using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

BDD objected at the charge conference and requested the inclusion of the negligence, ordinary care, and proximate cause definitions in the pattern jury charge for professional malpractice as to BDD. *See* State Bar of Tex., *Texas Pattern Jury Charges: Malpractice* PJC 60.1 (2012).

Certain professions are held to a higher standard of care because they "hold themselves out as having superior knowledge, training, and skill." *See id.* at 107; *see also Atkins v. Crosland*, 406 S.W.2d 263, 264 (Tex. Civ. App.—Fort Worth 1966) (holding accountants to the higher standard of care for professionals because they are "a skilled professional class" and "are subject generally to the same rules of liability for negligence in the practice of their profession as are members of other skilled professions"), *rev'd on other grounds*, 417 S.W.2d 150 (Tex. 1967). For such professions, expert testimony is needed to establish the proper standard of care. *See Palmer v. Espey Huston & Assocs., Inc.*, 84 S.W.3d 345, 354 (Tex. App.—Corpus Christi 2002, pet. denied) (holding that absence of expert testimony on the elements of a professional negligence claim against engineers "necessitated entry of directed verdicts" in favor of the engineers); *Parkway Co. v. Woodruff*, 857 S.W.2d 903, 919 (Tex. App.—Houston [1st Dist.] 1993) *aff'd as modified*, 901 S.W.2d 434 (Tex. 1995) (holding that a directed verdict was proper when there was no expert testimony on "the applicable engineering standard of care"); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 150.002 (West 2011) (requiring a certificate of merit in a suit against a licensed architect, licensed professional engineer, registered professional land

19

surveyor, or registered landscape architect by a professional who can set forth the negligence for which the plaintiff is suing).

The standard of care for a licensed engineer is "that which an engineer of ordinary prudence in the exercise of ordinary care would not have done under the same or similar circumstances or failing to do that which an engineer of ordinary prudence in the exercise of ordinary care would have done under the same or similar circumstances." *Parkway Co.*, 857 S.W.2d at 919; *see also Westchester Enters., L.P. v. Grand Homes, Inc.*, No. 05-98-01829-CV, 2001 WL 953237, at *5 (Tex. App.—Dallas Aug. 23, 2001, pet. denied) (not designated for publication) (applying the same standard of care for engineers). This standard maps the language of the pattern jury charge for nonmedical professionals and the language requested by BDD. The standard of care for licensed civil engineers is different than the standard of care for other parties, and the jury was not given an instruction indicating that. On remand, the jury should be instructed with the proper standard. We sustain BDD's second issue.

## II. Securlock's appeal

### A. Breach of contract

In Securlock's first issue in its cross-appeal, it argues that the trial court erred by granting Portrait Homes's motion for directed verdict on Securlock's claim for breach of contract. A directed verdict is proper only under limited circumstances: (1) when the evidence is insufficient to raise a material fact issue, or (2) when the evidence conclusively establishes the right of the movant

20

to judgment or negates the right of the opponent. *See Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000); *Farlow v. Harris Methodist Fort Worth Hosp.*, 284 S.W.3d 903, 919 (Tex. App.—Fort Worth 2009, pet. denied). In reviewing a directed verdict, we follow the standards for assessing legal sufficiency of the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We review the evidence in the light most favorable to the person suffering the adverse judgment, and we must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827; *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011).

In 2004, Portrait Homes and Securlock entered into a "Temporary Construction Consent Agreement." The contract stated that its purpose was

> [f]or the (i) removal of the existing 24" storm water pipeline and headwalls, including the cutting of a path across an existing concrete driveway on the Consent Property,[10] (ii) installation and construction, including excavation, of a 30" storm water pipeline and headwalls[,] (iii) and any other related work across the Consent Property and repair of the existing concrete driveway and adjacent property, all in accordance with the plans attached as Exhibit A and as stated in this Agreement (collectively, the "Facilities").

Exhibit A was not submitted into evidence. The agreement also stated, "[Portrait Homes] shall construct the Facilities in a good and workmanlike manner in

---

[10]"Consent Property" was defined in the agreement as "[t]he portion of the driveway extending from Securlock's Property to the southbound service road of State Highway 121, Bedford, Tarrant County, Texas, as more particularly shown on the attached Exhibit A."

accordance with the plans and specifications stated in this Agreement and in compliance with all applicable laws, statutes, ordinances[,] and codes." Securlock argues that Portrait Homes breached the agreement because (1) the jury's finding that Portrait Homes violated section 11.086 of the water code establishes that Portrait Homes did not perform its work "in compliance with all applicable laws, statutes, ordinances, and codes"; (2) Portrait Homes decided not to install a thirty inch pipe as contemplated in the agreement, but instead installed a thirty-three inch pipe, which was "too small to accommodate the increased amount of water"; and (3) the thirty-three inch pipe was installed too low and caused the back up of water in the drainage system.

The consent agreement clearly defines its scope to extend only to the removal and replacement of the pipes running under Securlock's driveway. It does not extend to any other part of Portrait Homes's sewer system, nor to the system's design. "Good and workmanlike" work is "that quality of work performed by one who has the knowledge, training, or experience necessary for the successful practice of a trade or occupation and performed in a manner generally considered proficient by those capable of judging such work." *Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 354 (Tex. 1987). A guarantee to perform repairs in a good and workmanlike manner is not a guarantee of the results of the work. *Id.* Thus, any complaint that the sewer system did not function properly must be a complaint about the construction of the pipeline under Securlock's driveway if it is to be covered by this agreement.

22

Securlock argues that the placement of the thirty-three inch pipe was lower than the original twenty-four inch pipe's placement. However, there is no evidence that the lower placement was a deviation from the plans attached to the agreement. As noted above, Securlock did not submit the plans into evidence. BDD's senior project manager's testimony indicated that BDD design's called for the pipe to be lower so that it would fit under Securlock's driveway. Securlock points to the testimony of its expert, Walter Nelson, who testified that the lower position of the thirty-three inch pipe caused water in the pipe to back up. Nelson did not testify to any defect in the construction of the pipe itself. There was no evidence that the pipe's lower placement violated the terms of the consent agreement.

As to any water code violation by Portrait Homes, we already stated that Portrait Homes is not liable under the water code for damages caused by water already in its sewer system. Water flowing in the pipes is not surface water, and any defect in the construction of the pipes cannot lead to a violation of the water code. As this is the only law, statute, ordinance, or code that Securlock points to, there is no evidence that Portrait Homes's pipe construction was noncompliant.

As to the size of the pipe, Securlock acknowledges in its reply brief, "It was not the change in size of the pipe in isolation that caused the problem. It was the change in size of the pipe in conjunction with the installation of the pipe further down into the box culvert that caused the problem." Securlock goes on to explain that the problems occurred "when the pipe was lowered further down into

23

the box culvert such that the flow from it was hit head on by the water flowing from the [other] pipe" and that "[t]hese problems could not be overcome by increasing the size of the new pipe to 33 inches." Securlock's argument is solely based on the location of the pipe. It points to no evidence that the larger pipe, assuming that the installation of the larger pipe was a breach of the agreement, damaged Securlock in any way. Because Securlock produced no evidence that it was damaged by the change in size of the pipe, its breach of contract claim cannot be sustained on that ground. *See Wood Care Ctrs., Inc. v. Evangel Temple Assembly of God of Wichita Falls, Tex.*, 307 S.W.3d 816, 824 (Tex. App.—Fort Worth 2010, pet. denied) (stating that a plaintiff must prove resulting damages to prevail on a breach of contract claim).

Securlock presented no evidence that Portrait Homes breached the consent agreement by failing to construct the pipeline in a good and workmanlike manner or by failing to comply with applicable laws, statutes, ordinances, and codes. Securlock also presented no evidence that it was damaged by the change in pipe size. Because Securlock did not present evidence to sustain its breach of contract claim, the trial court did not err in granting Portrait Homes's motion for directed verdict on the claim. We overrule Securlock's first issue.

## B. Gross negligence

In Securlock's second issue, it argues that the trial court erred by granting Portrait Homes's motion for directed verdict on Securlock's claim for gross negligence. Gross negligence means an act or omission

24

(A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and

(B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

Tex. Civ. Prac. & Rem. Code Ann. § 41.001(11) (West 2008). Gross negligence is not the result of "momentary thoughtlessness, inadvertence, or error of judgment." *Wal-Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 326 (Tex. 1993). Evidence of simple negligence is not enough to prove either the objective or subjective elements of gross negligence. *Universal Servs. Co. v. Ung,* 904 S.W.2d 638, 641 (Tex. 1995).

As evidence of gross negligence, Securlock points to testimony that when the property began flooding, Portrait Homes suggested that Securlock implement improvements on its own property, that Portrait Homes delayed in installing the missing restrictor plate, and that Portrait Homes had promised to build a trench drain but never built it. Securlock claims that Portrait Homes's delays in fixing the sewer system showed a conscious indifference to Securlock's problems.

Securlock cites to *Bily v. Omni Equities, Inc.*, 731 S.W.2d 606, 614 (Tex. App.—Houston [14th Dist.] 1987, writ ref'd n.r.e.), for the proposition that evidence of intentionally continuing to impound water in violation of the water code can support a finding of conscious indifference. In *Bily*, the plaintiff Bily sought and obtained a temporary injunction ordering the defendant to build a

ditch to drain the water flooding his property. *Id.* at 609. The court noted that the defendant "admitted that he made no effort to correct the problem other than to file criminal complaints against Bily after the temporary injunction had been granted," evidencing his conscious indifference to Bily's rights. *Id.* at 614.

In this case, however, there is evidence that Portrait Homes made investigations into the problem. Bruno Pasquinelli, the division manager for Portrait Homes, testified that when Securlock brought the flooding to Portrait Homes's attention, he set up meetings to evaluate the flooding. Pasquinelli testified that he visited Securlock's facility "probably . . . 20 times or more" after Securlock first complained of flooding. He said that he tried to visit Securlock's property when it had rained to see the flooding. He claimed he told Securlock,

> We don't know where the water's coming from, but what we see right here is you should take these trees out, redo this swale, expose some foundation. And if what you're saying is true, water's coming from Park Avenue, you know, you might be able to build a small berm.

Pasquinelli also testified that Portrait Homes contacted BDD and asked it to review the design plans to make sure the flooding was not coming from Durango Ridge and that Portrait Homes "worked closely with the city" to determine the source of the flooding.

Pasquinelli did testify that Portrait Homes considered building the trench drain. He said that plans for the trench were drawn up and sent to the city for approval but that the city concluded that no excess water was coming from the Durango Ridge development. Portrait Homes provided evidence in the form of

26

emails showing that it conducted an investigation into possible defects in its drainage system that could be flooding Securlock and that it was communicating with the city regarding the results. Pasquinelli testified that the city wrote letters stating that Portrait Homes was not at fault. He also testified that Portrait Homes did not originally offer to pay for improvements to Securlock's property because it had not conducted an investigation to see if it was the cause of the flooding.

The evidence shows that Portrait Homes investigated Securlock's complaints of flooding but determined that it was not at fault. With the benefit of hindsight, we can see that this conclusion may be erroneous, but that is not how gross negligence is determined. *See Reeder v. Wood Cnty. Energy, LLC*, No. 10-0887, 2012 WL 3800231, at *7, (Tex. Aug. 31, 2012) ("Determining whether an act or omission involves peril requires 'an examination of the events and circumstances from the viewpoint of the defendant at the time the events occurred, without viewing the matter in hindsight.'") (quoting *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 23 (Tex. 1994)); *Wal-Mart Stores, Inc.*, 868 S.W.2d at 326 (stating that gross negligence cannot be based on an error in judgment). That Portrait Homes refused to pay for damages for which it did not think it was responsible or implement improvements that it had been told were unnecessary is not evidence of conscious indifference to Securlock's rights. *See LaRue v. Chief Oil & Gas, L.L.C.*, 167 S.W.3d 866, 879 (Tex. App.—Fort Worth 2005, no pet.) (holding that there was no evidence of gross negligence when the defendant's efforts to clean up a dangerous construction site were not effective

but had been undertaken without indifference as to whether the job had been done properly). The trial court therefore did not err by granting Portrait Homes's motion for directed verdict on Securlock's gross negligence claim. We overrule Securlock's second issue.

## Conclusion

Having overruled Securlock's two issues, we affirm the trial court's orders granting directed verdicts on Securlock's claims for breach of contract and gross negligence. Having sustained Portrait Homes's second issue and BDD's first and second issues, we reverse and remand the case for a new trial on Securlock's remaining claims in a manner consistent with this opinion.

LEE GABRIEL
JUSTICE

PANEL: LIVINGSTON, C.J.; MCCOY and GABRIEL, JJ.

DELIVERED: March 28, 2013

28